

**FILED**

FEB 2 8 2002

UNITED STATES DISTRICT COU
NORTHERN DISTRICT OF ALABM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

JAMES ESPY,                          )
                                     )
      Plaintiff,                     )
                                     )
v.                                   )        Case No.: CV-01-PT-2763-M
                                     )
FEDERAL EXPRESS CORPORATION          )
and KEMPER NATIONAL SERVICES,        )
INC.,                                )                    **ENTERED**
                                     )
      Defendants.                    )              FEB 2 8 2002

**MEMORANDUM OPINION**

This cause comes to be heard upon plaintiff James Espy's Motion for Summary

Judgment filed on November 15, 2001, and defendants Federal Express Corporation and Kemper

National Services, Inc.'s Cross-Motion for Summary Judgment filed on December 10, 2001.

**FACTS AND PROCEDURAL HISTORY**

James Espy ("Espy") was hired by defendant Federal Express Corporation ("FEC") on

October 8, 1984.  FEC is the Plan Administrator of its Long Term Disability Plan ("LTD Plan").[1]

---

[1]  The LTD Plan defines "Disabled" as:

> Disability or Disabled shall mean either an Occupational Disability or a Total Disability;
> provided, however, that a Covered Employee shall not be deemed to be Disabled or under a
> Disability unless he is, during the entire period of Disability, under the direct care and treatment
> of a Practitioner and such Disability is substantiated by *significant objective findings* which are
> defined as signs which are noted on a test or medical exam and which are considered significant
> anatomical, physiological or psychological abnormalities which can be observed apart from the
> individual's symptoms.  (emphasis added).

The LTD Plan defines "Occupational Disability" as:

> Occupational Disability shall mean the inability of a Covered Employee, because of a medically-
> determinable physical impairment or Mental Impairment (other than an impairment caused by a
> Chemical Dependency), to perform the duties of his regular occupation.  Occupational Disability
> shall include a natural physical deterioration which impairs a Covered Employee's ability in
> connection with his duties in the operation or maintenance of an aircraft, vehicle or any other such
> equipment requiring licensing for its operation or maintenance and which results in the revocation
> of such license and denial of restoration thereof.

22

Defendant Kemper National Services ("KNS") is the Claims Paying Administrator of the LTD Plan. At all times relevant to this action, Espy was a covered participant under the LTD Plan issued by FTC.

While delivering packages for FEC on September 26, 1999, Espy injured his back when he fell after being attacked by a dog. Initially, Espy was treated with epidural injections to relieve the pain in his back. These injections did not help. On May 16, 2000, Espy was seen by doctors at the Northeast Orthopedic Clinic. The doctor's notes indicate that Espy was "still [having] significant symptoms of his neurological impingement and spondylolisthesis." Espy was later diagnosed by Dr. Martin Jones ("Jones") with grade 2 spondylolisthesis at L4-5 level with advanced degenerative disc disease. On July 21, 2000, Jones performed a posterior lumbar interbody fusion at L4-5.

Espy went to Dr. Jones for a follow up examination on August 17, 2000. Dr. Jones noted that Espy was "doing great" and that "he is 100% better." The physical examination revealed that the "wound is well healed." The X-rays showed that "everything is healing in good position." Dr. Jones' assessment was that Espy "can gradually increase his activities."

Espy returned to Dr. Jones' office for his three month post-op follow up on October 23, 2000. Dr. Jones noted that Espy was "actually doing well" and had "done fine from the standpoint of his back." Dr. Jones' physical exam revealed that the wound was "well healed." Espy had really good range of motion and motor strength in his lower extremities was 5/5 and symmetrical. X-rays indicated that the fusion was "healing in good position." Dr. Jones issued a "Return to Work Statement" that provided that Espy was not to return to work until his next appointment on January 25, 2001.

On January 25, 2001, Espy went to Dr. Jones' office complaining of leg pain and

2

numbness in his right arm.  Dr. Jones commented that "[h]e is doing reasonably well from the standpoint of his back.  He does still have some leg pain intermittently."  Espy's back exam revealed that his wound was well healed.  X-rays of the lumbar spine indicated that his fusion was healing well.

On March 13, 2001, KNS sent a questionnaire to Dr. Jones for an assessment of Espy's medical condition.  KNS asked Dr. Jones to address the questions with "specific objective clinical data."  In his response, Jones indicated that Espy could not return to work full duty at that time.  Jones also indicated that Espy could not return to work light duty.  However, Jones did not provide any further objective clinical findings to support these responses.  Jones did comment that a functional capacity evaluation would be required to assess Espy's permanent limitations.

On April 4, 2001, Espy received an independent medical evaluation by Dr. Carlos Ganuza ("Ganuza").  In his neurological assessment, Dr. Ganuza indicates that Espy was able to squat about half way down and that activity elicited severe pain in his lower back and in the area of the right hip and thigh.  Dr. Ganuza noted that the lumbar area was slightly painful to palpation and was very painful to flexion and motion in all directions.  His prognosis was that Espy would likely remain with a degree of lumbar pain radiating to the right leg and that it was unlikely at this point that he will have any significant improvement.  Using the *Guides to the Evaluation of Permanent Impairment of the American Medical Association*, 5th Edition, page 384, table 15.3, DRE V, Dr. Ganuza indicated that Espy had a 25% of whole person rating.

On April 9, 2001, Espy returned to Dr. Jones' office for a follow up.  Dr. Jones' notes indicate that the X-ray of the lumbar spine looked fine.  He commented that "[e]verything seems to be healing in good position."  Dr. Jones performed a neurological exam.  His notes indicate

3

that Espy's motor strength in the upper and lower extremities were 5/5 and symmetrical. Dr. Jones' back exam revealed that there was no evidence of significant paraspinal spasm or soft tissue swelling. In the Assessment/Plan section of Espy's chart, Dr. Jones states that he has been asked by Kemper to assess Espy's work abilities and limitations. Dr. Jones declared that "[r]eally at this point in time there is no way to do it without a functional capacity evaluation . . . that is the only way we are going to be able to know definitively what the limitations are."

On April 15, 2001, KNS conducted a "General Peer Review" of Espy's disability status. In preparing the review, Dr. Eddie Sassoon ("Sassoon") reviewed correspondence from Dr. Jones dated August 17, 2000; October 23, 2000; January 25, 2000; and April 9, 2001. Sassoon also reviewed the operative report dated July 21, 2000. Dr. Sassoon determined that the data reviewed did not substantiate that a functional impairment exists that would render Espy unable to perform the essential duties of a courier.[2] Dr. Sassoon's rationale for this conclusion was primarily based on Dr. Jones' evaluations that indicated that Espy's strength was intact in the lower extremities, that the wound was well healed, and that there were no neurological and orthopedic deficits. He also noted that Espy's X-rays revealed that he was healing well with good instrumentation. Sassoon concluded that there was "insufficient clinical documentation to preclude the patient from returning to his previous level of function as a Courier."

On April 24, 2001, KNS sent Espy a letter stating "[i]t has been determined that no benefits are payable to you for this claim beyond 4/11/2001." KNS also stated in the letter that "the medical information does not show significant objective findings nor have we received medical information to determine, pursuant to the terms of the Plan, that a disability exists."

---

[2] The job requirements for a FEC courier are the ability to lift/maneuver seventy-five pounds and drive a commercial vehicle.

Espy appealed the denial of the continued LTD benefits.  As part of this appeal, Espy submitted two letters from Dr. Jones and the independent medical evaluation from Dr. Ganuza. Espy submitted a letter from Dr. Jones dated June 21, 2001, which indicated that Espy was still under his care recovering from the fusion surgery.  Jones stated that Espy was "not working at this time, he is under disability."  Espy also submitted a letter from Dr. Jones dated June 22, 2001, which stated that Espy's lumber fusion surgery could take twelve to eighteen months to heal completely.  It also stated that if the fusion did not heal properly it could cause a nonunion which would require another surgery.  It noted that Espy was returning to Dr. Jones' office on August 31, 2001, for a repeat X-ray to check the progression of his spinal fusion.

Espy voluntarily resigned his employment with FEC on August 7, 2001.  FEC had paid short term disability benefits from February 8, 2000, until August 27, 2000.  FEC had also paid long term disability benefits from August 28, 2000, until April 11, 2001.

On August 8, 2001, KNS conducted another "General Peer Review" of Espy's disability status.  This review was conducted by Dr. Blumberg.  Dr. Blumberg reviewed the information considered in the prior review as well as the letters from Dr. Jones and the independent medical evaluation performed by Dr. Ganuza.  Dr. Blumberg determined that the clinical data did not substantiate that a functional impairment exists that would render Espy unable to perform the essential duties of his job.  Dr. Blumberg's rationale for this decision was based on the examinations of Dr. Jones and Dr. Ganuza.  Dr. Blumberg noted that Dr. Jones' evaluation of April 9, 2001 revealed only mild tenderness in the lumbar region, no muscle spasm and a normal neurological examination.  He also commented that Dr. Ganuza's evaluation revealed a normal neurological evaluation and normal muscle strength.

On August 30, 2001, Espy received notice from the Social Security Administration that it

5

had determined that Espy had been disabled since February 8, 2000.  The Administrative Law Judge ("ALJ") found that Espy's impairments which are considered to be "severe" under the Social Security Act were his degenerative disc disease, disc herniation L1-2, status post lumbar fusion at L4-5, spondylolisthesis Grade II, radicular pain on the right and cervical pain.  The ALJ found that Espy's impairments prevent him from performing work activity above the sedentary exertion level.  The ALJ also found that Espy was unable to perform his past relevant work.

On September 19, 2001, the FEC's Benefit Review Committee ("BRC") reviewed Espy's request for LTD benefits beyond April 11, 2001.  The BRC denied Espy's request on the "basis of the plan provision which states no benefits will be paid by the plan unless evidence of significant objective findings exists that would prevent you from performing the duties of your occupation."[3]  The BRC based this decision on KNS's physician reviews and the clinical information submitted with Espy's appeal request.  It concluded by commenting that its decision represented the final step of the administrative review process.

After exhausting his administrative appeals, Espy filed this civil action in the Circuit Court of Etowah County, Alabama.  In Count I of the complaint, Espy alleged that he was

---

[3]  The LTD Plan's summary plan description states:

**Significant Objective Findings (Proof of Disability)**

Significant objective findings of a disability are necessary to substantiate the period of time your health care professional indicates you are disabled.  Significant objective findings are those that can be observed by your health care professional through objective means, not just from your description of the symptoms.  Objective findings include:

–   Medical examination findings
–   Test results
–   X-ray results
–   Observation of anatomical, physiological or psychological abnormalities

**Pain, without significant objective findings, is not proof of disability.**

(emphasis in original).

6

entitled to LTD benefits under the LTD Plan.  In Count II of the complaint, Espy alleged that

FEC made an intentional bad faith denial of his benefits.  On October 31, 2001, FEC and KNS

removed the state court action to this court.  By an amended complaint filed on November 14,

2001, Espy restated Count I as a claim for wrongful denial of benefits under ERISA.  Espy also

amended the complaint by dismissing the claim for bad faith refusal to pay benefits.  On

November 15, 2001, Espy filed a motion for summary judgment on his claim for wrongful denial

of LTD benefits.  On December 10, 2001, FEC and KNS filed a cross-motion for summary

judgment on the same issue.

## ARGUMENTS

In reviewing FEC's decision to terminate Espy's LTD benefits, Espy argues, this court

should apply a *de novo* or heightened arbitrary and capricious standard of review.  According to

Espy, *de novo* review is the standard review of administrator's decisions, unless the plan

document explicitly vests the administrator with discretion.  *See Florence Nightingale Nursing*

*Services v. Blue Cross*, 41 F.3d 1476, 1481 (11th Cir. 1995), *cert. denied*, 514 U.S. 1128 (1995)

("The Supreme Court has held that, as a general matter, courts should review claims

administrators' denials of ERISA benefits under a *de novo* standard.").  Espy notes that the

Eleventh Circuit has created a heightened arbitrary and capricious standard where the

decisionmaker has a conflict of interest.  *See Brown v. Blue Cross & Blue Shield*, 898 F.2d 1556

(11th Cir. 1990), *cert. denied*, 498 U.S. 1040 (1991).  Under this standard, the court must "first

conduct a *de novo* review to decide if the determination was wrong." *Godfrey v. BellSouth*

*Telecommunications, Inc.*, 89 F.3d 755, 758 (11th Cir. 1996).  As Espy explains, if the decision

of the administrator was wrong, the court must then determine whether the decision was

reasonable, and, if so, whether it advances the conflicting self-interest of the defendant.  *Id.*

7

Espy asserts that FEC grants discretionary authority to its own in-house review committee.[4]

Espy claims that an inherent conflict of interest exists because the LTD Plan is self-funded and

FEC reserves final authority to approve or deny benefits. Thus, Espy states the standard of

review should be *de novo* since there has been no effective delegation of authority to a third

party. If this court does not apply the *de novo* standard, Espy argues, the heightened arbitrary

and capricious standard applies.

Espy argues that FEC and KNS made the wrong decision under either standard of review.

According to Espy, he is disabled as defined by the LTD Plan and is entitled to benefits. *See* 29

U.S.C. § 1132(a)(1)(B).[5] In support of this proposition, Espy asserts that he had not been

released from the care of his treating physician, Dr. Jones.[6] He claims that the letters of Dr.

Jones, dated June 21 and 22, 2001, confirm his disability. In the letters submitted by Espy's

counsel to FEC, Dr. Jones stated that his staff had repeatedly attempted to contact KNS to

discuss Espy's condition:

> I have received notice that he had been returned back to work as of 4/4/01. This
> was due to lack of medical information to support continued disability. Mr. Espy
> had a spinal fusion at L4-5 on 7/21/00. That surgery can take twelve to eighteen
> months to heal completely. In my 4/9/01 office note I do state that the fusion is
> healing in good position. That does not mean it is completely healed. Mr. Espy
> has a return appointment on 8/31/01 for a repeat x-ray to check the progression of

---

[4] *See* LTD Plan § 5.3(d).

[5] The definition of "Total Disability" under the plan reads as follows:

Total Disability shall mean the complete inability of a Covered Employee, because of a
medically-determinable physical impairment (other than an impairment caused by a mental or
nervous condition or a Chemical Dependency), to engage in any compensable employment for
twenty-five hours per week for which he is reasonably qualified (or could reasonably become
qualified) on the basis of his ability, education, training or experience.

[6] On April 9, 2001, Dr. Jones submitted a report to KNS that stated the following: "no lifting. Patient is
off work until 8/13/01."

> his spinal fusion.  If the fusion does not heal properly it can cause a non-union
> which would require another surgery.  My staff has repeatedly tried to reach
> Kemper to discuss this problem with no results.  If he could be returned for some
> type of light duty he would need to get an FCE to get permanent restrictions.

Instead of exercising their option to have Espy submit to examination by another physician, Espy

contends, FEC and KNS simply submitted his medical records to Dr. Sassoon.  Espy notes that

Dr. Sassoon did not state an opinion that Espy was not disabled.  Instead, Dr. Sassoon stated that

there were no objective findings of disability.[7]  Finally, he notes that he has been awarded Social

Security disability benefits with an onset date of February 8, 2000.

In light of these facts, Espy claim that there is no evidence to substantiate a denial of

benefits under any standard of review.  Since the decision was wrong, Espy explains that the

court must next determine whether the decision was reasonable and, if so, whether it advances

the conflicting self-interest of the defendant.  *Relying on Godfrey*, 89 F.3d at 758.  Espy argues

that the decision was not reasonable because Dr. Jones' report dated April 9, 2001 clearly states

that Espy could not lift or return to work.  Espy states that KNS never wrote Dr. Jones or

questioned him concerning his evaluation.  Instead, Espy notes, KNS submitted his medical

records for a "paper review" to Dr. Sassoon.  KNS and FEC based their decision on Dr.

Sassoon's findings that there were no significant objective findings of disability.  Espy contends

that this is a new requirement for coverage and is not a requirement listed in the LTD Plan.[8]

Relying on *Nightingale*, Espy contends that this decision was arbitrary and capricious because it

was based on new requirements added for coverage: "A claims administrator's decision is

arbitrary and capricious where new requirements for coverage are added to those enumerated in

---

[7]  According to Espy, this is not a valid basis for terminating benefits under the terms of the LTD Plan.

[8]  See, however, note 1 above.

9

the plan." 41 F.3d at 1484.[9]

FEC and KNS make two arguments to support their opposition to Espy's motion and their cross-motion for summary judgment. First, they argue that the decision made by the BRC was legally correct. According to FEC and KNS, a court reviewing a plan administrator's denial of benefits must first determine if the decision of the administrative review committee was legally correct. *Relying on Collins v. American Cast Iron Pipe Co.*, 105 F.3d 1368, 1370 (11th Cir. 1997). If the committee's decision was legally correct, FEC and KNS argue, the inquiry ends there.

FEC and KNS contend that the BRC's decision was legally correct for several reasons. First, they note that reports from Espy's doctor state that the spinal fusion was healing solidly and that his muscles were at full strength. Second, they state that Dr. Jones suggested that Espy obtain a functional capacities evaluation report to determine Espy's work abilities and limitations. However, they note, Espy never submitted a functional capacities evaluation to KNS or the BRC. Third, they state that Espy's independent medical evaluation performed by Dr. Ganuza revealed normal neurological evaluation and normal muscle strength. They also note that the evaluation indicated that Espy "certainly" reached maximum medical improvement "at the time of examination" on April 4, 2001. Fourth, they contend that Espy's argument that

---

[9] Espy also claims that adding the requirements of "objective medical evidence" to support a claim for LTD benefits, where the policy does not require such evidence, was condemned in *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442-43 (3d Cir. 1997):

> According to the record before us, the Administrator denied Mitchell's claim for LTD benefits because Mitchell had failed to tender "objective medical evidence" that he was unable to engage in any substantial gainful work as of June 26, 1989.  We hold that, in this context, it was arbitrary and capricious for the administrator to deny Mitchell LTD benefits for this reason . . . .

> All that the Plan required was that Mitchell show that he was in fact "disabled" as of June 26, 1989, and this he did.

10

the LTD Plan does not require "objective findings" to substantiate a claim for disability is

meritless.  They state that the plain language of the LTD Plan specifically requires that a

disability be "substantiated by significant objective findings."[10]  Finally, they assert that the LTD

plan's "Cessation of Benefits" section provides that benefits will cease when the employee

"recovers from his Disability" or "fails to furnish . . . information, as requested by, . . . the

Claims Paying Administrator."  According to FEC and KNS, either reason applies to this case.

For example, they contend that the information submitted by Dr. Jones that the spinal fusion was

healing solidly and that Espy's muscles were at full strength could be interpreted as objective

evidence that Espy had recovered from his disability.  Further, they note that Espy failed to

submit information to the Claims Paying Administrator (KNS) that demonstrated significant

objective findings of disability.[11]

Second, they argue that even if the administrator's decision was legally incorrect, the

court may still uphold the decision if the plan grants the administrator discretion and the

administrator's decision was not arbitrary and capricious.[12]  *See Collins*, 105 F.3d at 1370.  FEC

and KNS contend that the LTD Plan grants discretion to the BRC and, consequently, this court

must review the BRC's decision to deny Espy's claim for LTD benefits under the arbitrary and

---

[10]  *See supra* note 1.

[11]  According to FEC and KNS, the Claims Paying Administrator (KNS) requested "medical
documentation that clearly states the significant objective findings to support the existence of a disability as defined
by the Plan."  Despite this request, they claim that Espy failed to furnish information detailing significant objective
findings of disability.

[12]  According to the defendants, the Eleventh Circuit has "adopted three standards of review for plan
interpretations: (1) *de novo*, applicable where the plan administrator is not afforded discretion, (2) arbitrary and
capricious when the plan grants the administrator discretion, and (3) heightened arbitrary and capricious where there
is a conflict of interest."  *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1449 (1997).

capricious standard.[13]  FEC and KNS claim that not only is the plan interpretation subject to

arbitrary and capricious review, but the plan administrator's factual findings are to be reviewed

under the arbitrary and capricious standard.  *See Parker v. Rose*, 147 F. Supp. 2d. 1376, 1380

(M.D. Ga. 2001).  When reviewing pursuant to the arbitrary and capricious standard, FEC and

KNS conclude, "the function of the court is to determine whether there was a reasonable basis

for the decision, based upon the facts as known to the administrator at the time the decision was

made."  *Jett v. Blue Cross & Blue Shield*, 890 F.2d 1137, 1139 (11th Cir. 1989).

    FEC and KNS contend that the Committee's decision to deny further LTD benefits was

not arbitrary and capricious.  They assert that this decision was supported by substantial

evidence in the administrative record.  In support of this proposition, defendants state that Dr.

Jones often noted that the fusions were healing well and that Espy's muscle strength was good.[14]

FEC and KNS also point out that Dr. Jones' notes from the April 9, 2001 office visit revealed "a

normal neurological examination" and the x-rays showed "that the fusion was solid."  In

concluding, they assert that even if this court should disagree with the BRC's decision, that

---

[13]  FEC and KNS claim that the following language from the LTD Plan demonstrates that it grants
discretionary authority to the Committee:

> Authority of Committee: The committee appointed pursuant to Subsection (c), shall be
> empowered to interpret the Plan's provisions in accordance with its terms with respect to all
> matters properly brought before it pursuant to this Section 5.3, including, but not limited to,
> matters relating to the eligibility of a claimant for benefits under the Plan.  The determination of
> the committee shall be made in a fair and consistent manner in accordance with the Plan's terms
> and its decisions shall be final, subject only to a determination by a court of competent jurisdiction
> that the committee's decision was arbitrary and capricious.

[14]  Defendants also point out that Dr. Jones stated that a functional capacities evaluation would help
determine Espy's work abilities and limitations and that Espy never submitted such an evaluation to KNS or to the
Committee.

12

decision is reasonable and supported by substantial evidence in the Administrative Record.[15]

Finally, FEC and KNS argue that Espy's position that *de novo* or heightened arbitrary and capricious review is appropriate is erroneous. They contend that Espy's position that *de novo* review is appropriate because "Federal Express reserves the final authority to approve or deny benefits" is simply untrue. To the contrary, they argue that the plan grants discretionary authority to the BRC and, thus, *de novo* review does not apply. Likewise, they argue that heightened arbitrary and capricious review is not appropriate because there is no conflict of interest in the BRC's denial of benefits. In support of this proposition, they note that the LTD Plan is an uninsured plan.[16] The payments are made to beneficiaries out of the assets of a trust and not FEC's general operating budget. Further, FEC's contributions to the LTD Plan are "irrevocable" and can never inure to the benefit of FEC.[17] Finally, they note that the BRC relies on independent medical consultants that have no interest in what the LTD Plan must pay out in

---

[15] FEC and KNS also comment on Espy's reliance on the Social Security Administration's award of disability benefits. They place little significance on this finding because the Social Security Administration's determination concerns a different proceeding, using a different standard. Defendants also point out that the Eleventh Circuit has already found that an award of benefits by the Social Security Administration is not dispositive in determining whether a plan administrator wrongfully denied benefits. *See Paramore*, 129 F.3d at 1446 n.5. *Paramore* suggests, however, that the award can be considered.

[16] FEC and KNS argue that this point is critical. They note that the Eleventh Circuit's decision in *Brown* is the seminal case in the nation regarding conflict of interest in ERISA cases. According to FEC and KNS, *Brown* specifically addressed the situation "where an insurance company serves as the decisionmaking fiduciary for benefits that are paid out of the insurance company's assets." 898 F.2d at 1561. They state that in discussing whether a conflict of interest factor should be part of the standard of review applied, the Eleventh Circuit noted that "[s]everal features distinguish insurance policy plans from other forms of ERISA plans." *Id.* They further argue that the Eleventh Circuit found that key distinction between insured and uninsured plans was that insurance plans were not held in trust for the beneficiaries. *Id.* They contend that this distinction led the Eleventh Circuit to apply the conflicts analysis to insured plans.

[17] It is not clear to the court, however, whether the contributions to the trust might have to be increased depending on prior payouts.

13

disability benefits.[18]  In light of these facts, FEC and KNS argue that there is no conflict of interest and request that this court apply the arbitrary and capricious standard of review.

## ANALYSIS

Summary judgment may be granted based upon facts developed during the pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of explaining the basis of his motion.  *Id.*  The non-moving party then bears the burden of showing that there are specific facts demonstrating that there is a genuine issue of fact for trial.  *Id.* at 324.  "When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999).  The trial court must resolve all reasonable doubts in favor of the non-moving party, but need not resolve all doubts in a similar fashion. *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987).

## CONCLUSIONS OF THE COURT

The court concludes that all the motions should be and will be denied.  Even if the court assumes that the arbitrary and capricious standard applies and that there must be significant

---

[18]  According to FEC and KNS, the Seventh Circuit has held that heightened arbitrary and capricious review is not necessary where the plan administrator uses independent medical consultants.  *See Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 n.3 (1994).

objective findings, the court concludes that the defendants' decision may have been arbitrary and

capricious. There was certainly evidence of more than subjective complaints. The following is a

further summary of the findings of the treating physicians.

**5/16/2000**: Espy was seen by doctors at the Northeast Orthopedic Clinic. Doctor's note from visit indicates that Espy was "still [having] significant symptoms of his neurological impingement and spondylolisthesis."

**8/17/2000**: Espy is seen by Dr. Jones for his one month post-surgery follow up. Dr. Jones noted that Espy was "doing great" and that "he is 100% better." The physical examination revealed that the "wound is well healed." The X-Rays showed that "everything is healing in good position." Dr. Jones' assessment was that Espy "can gradually increase his activities."

**10/23/00**: Dr. Jones sees Espy for his three month post-surgery follow up. The "Physical Examination" indicates that the "wound is well healed. He has really good range of motion. Motor strength in lower extremities including iliopsoas, quadriceps, hamstring, tibialis anterior, EHL, and gastroc soleus are 5/5 and symmetrical." The "X-Rays" of the lumbar spine showed "that his fusion is healing in good position." Also said "actually doing well" and had "done fine from the standpoint of his back."

**1/25/01**: Dr. Jones examines Espy. In the "Back Exam" section, Dr. Jones states that Espy's "wound is well healed. He is able to forward flex 85 degrees, extend 10 degrees, and laterally bend to either side 20 degrees." The "Neurologic Exam" indicated that "[m]otor strength in the lower extremities including the iliopsoas, quadriceps, hamstring, tibialis anterior, EHL, and gastroc soleus are 5/5 and symmetrical." The "X-Rays" of the lumbar spine showed "that his fusion is healing well. The instrumentation is in good position. The other levels are unremarkable." Also said that "[h]e is doing reasonably well from the standpoint of his back. He does still have some leg pain intermittently."

**4/4/2001**: Dr. Carlos Ganuza performed an independent medical evaluation on Espy. Under the "Neurological" Section of the evaluation Dr. Ganuza stated the following:

> Gait: Normal. He is able to stand on his heels and toes. Standing on the heels elicited some pain in the lower back. He is able to squat about half way down and that elicited severe pain in his lower back and in the area of the right hip and thigh.

In referencing the "Spine," Dr. Ganuza stated that the cervical area was "[p]ainful on motion, particularly in flexion and extension." The "Lumbar" area was "[s]lightly painful to palpation, and is very painful to flexion and motion in all directions." Dr. Ganuza gave the following diagnosis in the "Impression" section:

> 1) S/P Trauma to the lumbar spine with evidence of Spondylolisthesis Grade II.

15

This may have been present at the time of injury of September 26, 1999 but it was asymptomatic.
2) S/P Spinal Fusion at L4-5 with rod and screws.
3) Radicular pain toward the right leg.
4) Cervical pain probably secondary to Spondylosis.

Dr. Ganuza provided the following "Prognosis:" "Considering that Mr. Espy had surgery in his back with fusion, it is likely that he will remain with a degree of lumbar pain radiating to the right leg and it is unlikely at this point that he will have any significant improvement." As for "Maximum Medical Improvement," Dr. Ganuza noted that "[i]t is difficult to determine exactly when he achieved Maximum Medical Improvement, but certainly at the time of examination, he was at MMI." As for an "Impairment Rating," he noted that "there is 25% of whole person."

**4/9/2001**: Dr. Jones submits a patient evaluation to KNS. Dr. Jones stated that Espy "is off work until 8/13/01 when he will return to our office." When asked whether the patient can return to work full duty at this time, Dr. Jones stated "No." When asked whether the patient could return to light work duty, Dr. Jones stated "No." When asked to give objective clinical findings to support continued disability from work, Dr. Jones did not provide any further data in that evaluation. See, however, results of exam below on April 9, 2001. When asked whether the patient had reached maximum medical improvement, Dr. Jones stated "No." When asked whether the patient has any permanent restrictions, Dr. Jones stated the following: "Need FCE for permanent limitations."

**4/9/2001**: Dr. Jones sees Espy for a follow-up examination. The "Back Exam" reveals that Espy "has some mild tenderness to deep palpation of the low lumbar spine. There is no evidence of significant paraspinal spasm or soft tissue swelling." Dr. Jones noted the following results from his "Neurologic Exam:" "Motor strength in the upper extremities including deltoid, triceps, biceps, wrist flexors, wrist extensors, and intrinsics are 5/5 and symmetrical. Motor strength in the lower extremities including iliopsoas, quadriceps, hamstring, tibialis anterior, EHI, and gastroc soleus are 5/5 and symmetrical." The X-rays revealed that "the lumbar spine looked fine. Everything seems to be healing in good position." In the "Assessment/Plan" section, Dr. Jones notes that he had been contacted by KNS to assess Espy's work abilities and limitation. Dr. Jones stated that at "this point in time there is no way to do it without a functional capacity evaluation. He is far enough out from surgery that we could probably consider a functional capacity evaluation but that is the only way we are going to be able to know definitely what the limitations are."

**6/21/2001**: Dr. Jones writes a letter to KNS in which he states that Espy "had a spinal fusion at L4-5 on 7/21/2000. He is still under my care while the fusion heals. He is not working at this time, he is under disability." (Emphasis added).

**6/22/2001**: Dr. Jones writes a letter to KNS in which he discusses Espy's return to work:

> Mr. Espy had a spinal fusion at L4-5 on 7/21/2000. That surgery can take twelve to eighteen months to heal completely. In my 4/9/01 office note I do state that the

fusion is healing in good position. <u>That does not mean it is completely healed</u>.
Mr Espy has a return appointment on 8/31/01 for a repeat x-ray to check the
progression of his spinal fusion. If the fusion does not heal properly it can cause
a nonunion which would require another surgery. My staff has repeatedly tried to
reach Kemper to discuss this problem with no results. If he could be returned to
some type of light duty I would need to get an FCE to get permanent restrictions.
<u>I would be more worried about his bending, pushing, pulling, etc. than his
subjective complaints. Once again, if the fusion does not heal properly it would
require another spinal fusion to be performed with another twelve months of
healing. It is imperative that the fusion heal properly before doing any activities
that could cause the bone graft not to take.</u> (Emphasis added).

There are certainly significant objective findings stated therein. It would appear that the

reviewer(s) selectively considered the statements helpful to the defendants' position and

categorized the other clinical findings as non-objective. The social security finding is entitled to

some weight which was not given. The court cannot definitively determine without a trial

whether there is terminated temporary disability, permanent disability, occupational disability

and/or total disability.

Prior to trial, the parties may wish to have a FCE and consider reopening the review.

There are other issues which are not presently clear to the court. These include:

(1) Might FEC be required to increase its contributions to the trust if the payouts

increase?

(2) What weight, if any, was given to the social security findings?

(3) Why are some of the findings of the treating physician not objective?

(4) Why does the plaintiff suggest that the "objective findings" position is a change in

the plan?

(5) Did the defendants request more objective findings from the plaintiff or just from Dr.

Jones?

(6) Any other issues suggested in the foregoing.

17

This ___ day of February 2002.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

18