IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

**FILED**

SEP 1 7 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| JAMES ESPY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 01-PT-2763-M |
| | ) | |
| FEDERAL EXPRESS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTERED**

SEP 1 7 2002

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause comes on to be heard upon cross-Motions For Judgment. Both parties filed

Briefs in support of their Motions on August 15, 2002. Plaintiff James Espy ("Espy") filed a

Reply to Defendant Federal Express Corporation's ("FEC") Brief on August 19, 2002. FEC

filed a Reply to Espy's Brief on August 29, 2002. The parties have stipulated to the facts,[1] and

have asked the court to decide this case based upon the stipulated facts and their respective

Briefs and Replies.

## STIPULATED FACTS AND PROCEDURAL HISTORY

### I. The Underlying Claim

Espy was hired by FEC on October 8, 1984. As part of its overall benefits package, FEC

offers a Long Term Disability Plan ("LTD Plan") to its employees, and also acts as Plan

Administrator for the LTD Plan. Kemper National Services ("KNS")[2] is the Claims Paying

Administrator of the LTD Plan. At all times relevant to this action, Espy was a covered

participant under the LTD Plan issued by FEC.

---

[1] The stipulated facts were filed with the court on August 14, 2002.

[2] Kemper National Services, Inc. was dismissed from this suit by court order on May 3, 2002.

33

While delivering packages for FEC on September 26, 1999, Espy injured his back when he fell after being attacked by a dog. Initially, Espy was treated with epidural injections to relieve the pain in his back. These injections did not help. On May 16, 2000, Espy was seen by doctors at the Northeast Orthopedic Clinic. *See* Ex. 3 at C2. The doctor's notes indicate that Espy was "still [having] significant symptoms of his neurological impingement and spondylolisthesis." Espy was later diagnosed by Dr. Martin Jones ("Jones") with grade 2 spondylolisthesis at L4-5 with advanced degenerative disc disease. On July 21, 2000, Jones performed a posterior lumbar interbody fusion at L4-5. *See* Ex. 3 at C8-9.

Espy went to Dr. Jones for a follow up examination on August 17, 2000. *See* Ex. 3 at C1. Dr. Jones noted that Espy was "doing great" and that "he is 100% better." The physical examination revealed that the "wound is well healed." The X-rays showed that "everything is healing in good position." Dr. Jones' assessment was that Espy "can gradually increase his activities."

Espy returned to Dr. Jones' office for his three month post-op follow up on October 23, 2000. *See* Ex. 3 at C7. Dr. Jones noted that Espy was "actually doing well" and had "done fine from the standpoint of his back." Dr. Jones' physical exam revealed that the wound was "well healed." Espy had a really good range of motion, and motor strength in his lower extremities was 5/5 and symmetrical. X-rays indicated that the fusion was "healing in good position." However, despite Espy's improvement, Dr. Jones issued a "Return to Work Statement" that provided that Espy was not to return to work until his next appointment on January 25, 2001.

*See* Ex. 3 at C6.[3]

On January 25, 2001, Espy went to Dr. Jones' office complaining of leg pain and numbness in his right arm. *See* Ex. 3 at C4-5. Dr. Jones commented that "[h]e is doing reasonably well from the standpoint of his back. He does still have some leg pain intermittently." Espy's back exam revealed that his wound was well healed. X-rays of the lumbar spine indicated that his fusion was healing well.

On March 13, 2001, KNS sent a questionnaire to Dr. Jones for an assessment of Espy's medical condition. *See* Ex. 3 at C3. KNS asked Dr. Jones to address the questions with "specific objective clinical data." In his response, dated April 9, 2001, Jones indicated that Espy could not return to full duty at that time. Jones also indicated that Espy could not return to light duty either. However, Jones did not provide any further objective clinical findings to support these responses. Jones did comment that a functional capacity evaluation would be required to assess Espy's permanent limitations.[4]

On April 4, 2001, Espy received an independent medical evaluation by Dr. Carlos Ganuza ("Ganuza"). *See* Ex. 3 at B8-11. In his neurological assessment, Dr. Ganuza indicated that Espy was able to squat about half way down, but that this activity elicited severe pain in his lower back and in the area of the right hip and thigh. Dr. Ganuza noted that the lumbar area was slightly painful to palpation and was very painful to flexion and motion in all directions. His

---

[3]The court notes that the mere fact that someone does "well" or "great" after surgery is not tantamount to a full recovery. The doctor's hold on plaintiff's returning to work so indicates. So does his letter of June 22, 2001, in which he notes "I [did] state that the fusion is healing in good position. That does not mean it is completely healed." *See* Ex. 3 at B21.

[4]Again, the doctor delayed plaintiff's return to work. The "objective clinical data" was the pre-surgery examination and diagnosis, the surgery, and the indicated post-surgery problems.

prognosis was that Espy would likely remain with a degree of lumbar pain radiating to the right

leg and that it was unlikely at this point that he will have any significant improvement. Using

the *Guides to the Evaluation of Permanent Impairment of the American Medical Association*, 5th

Edition, page 384, table 15.3, DRE V, Dr. Ganuza indicated that Espy had a rating of 25% of a

whole person.[5]

On April 9, 2001, Espy returned to Dr. Jones' office for a follow up. *See* Ex. 3 at B22-

23. Dr. Jones' notes indicate that the X-ray of the lumbar spine looked fine. He commented that

"[e]verything seems to be healing in good position." Dr. Jones performed a neurological exam.

His notes indicate that Espy's motor strength in the upper and lower extremities was 5/5 and

symmetrical. Dr. Jones' back exam revealed that there was no evidence of significant paraspinal

spasm or soft tissue swelling. In the Assessment/Plan section of Espy's chart, Dr. Jones states

that he has been asked by Kemper to assess Espy's work abilities and limitations. Dr. Jones

declared that "[r]eally at this point in time there is no way to do it without a functional capacity

evaluation . . . that is the only way we are going to be able to know definitively what the

limitations are."

On April 15, 2001, KNS conducted a "General Peer Review" of Espy's disability status.

*See* Ex. 3 at E1. In preparing the review, Dr. Eddie Sassoon ("Sassoon"), a physiatrist, reviewed

(1) the May 16, 2000 report from the Northeast Orthopedic Clinic, (2) Dr. Jones' operative

report from July 21, 2000, (3) correspondence from Dr. Jones dated August 17, 2000; October

23, 2000; January 25, 2000; and April 9, 2001, and (4) Dr. Jones' notes from the April 9, 2001

report. Dr. Sassoon determined that the data reviewed did not substantiate that a functional

---

[5]While this diagnosis was arguably based somewhat on subjective pain, there is an objective feature to the examination.

impairment existed that would render Espy unable to perform the essential duties of a courier.[6]

Dr. Sassoon's rationale for this conclusion was primarily based on Dr. Jones' evaluations that

indicated that Espy's strength was intact in the lower extremities, that the wound was well

healed, and that there were no neurological and orthopedic deficits.  He also noted that Espy's X-

rays revealed that he was healing well with good instrumentation.  Sassoon concluded that there

was "insufficient clinical documentation to preclude the patient from returning to his previous

level of function as a Courier."[7]

On April 24, 2001, KNS sent Espy a letter stating "[i]t has been determined that no

benefits are payable to you for this claim beyond 4/11/2001."  *See* Ex. 3 at A1-2.  KNS also

stated in the letter that "the medical information does not show significant objective findings nor

have we received medical information to determine, pursuant to the terms of the Plan, that a

disability exists."[8]

Espy filed an appeal of the denial of the continued LTD benefits on April 30, 2001.  *See*

Ex. 3 at B1.  As part of this appeal, Espy submitted two letters from Dr. Jones and the

independent medical evaluation from Dr. Ganuza.  Espy submitted a letter from Dr. Jones dated

June 21, 2001, which indicated that Espy was still under his care and recovering from the fusion

surgery.  Jones stated that Espy was "not working at this time, he is under disability."  *See* Ex. 3

at B20.  Espy also submitted a letter from Dr. Jones dated June 22, 2001, which stated that

Espy's lumber fusion surgery could take twelve to eighteen months to heal completely.  It also

---

[6]The job requirements for a FEC courier are the ability to lift/maneuver seventy-five pounds and drive a commercial vehicle.  The evidence suggests that Dr. Sassoon's conclusion is highly questionable.

[7]This conclusion was arbitrary and capricious.

[8]There were manifest objective findings leading to surgery and the necessary recovery.

stated that if the fusion did not heal properly it could cause a nonunion which would require another surgery. It noted that Espy was returning to Dr. Jones' office on August 31, 2001, for a repeat X-ray to check the progression of his spinal fusion. *See* Ex. 3 at B21. Neither of these letters contained any new clinical information. The evaluation of Dr. Ganuza was submitted to KNS on July 26, 2001.

On August 8, 2001, KNS conducted another "General Peer Review" of Espy's disability status. *See* Ex. 3 at F1. This review was conducted by Dr. Lawrence Blumberg, an orthopedic surgeon. Dr. Blumberg reviewed the information considered in the prior review as well as the letters from Dr. Jones and the independent medical evaluation performed by Dr. Ganuza. Dr. Blumberg determined that the clinical data did not substantiate that a functional impairment exists that would render Espy unable to perform the essential duties of his job. Dr. Blumberg's rationale for this decision was based on the examinations of Dr. Jones and Dr. Ganuza. Dr. Blumberg noted that Dr. Jones' evaluation of April 9, 2001 revealed only mild tenderness in the lumbar region, no muscle spasm, and a normal neurological examination. He also commented that Dr. Ganuza's evaluation revealed a normal neurological evaluation and normal muscle strength.[9]

On August 30, 2001, Espy received notice from the Social Security Administration that he had been adjudged disabled, with an onset date of February 8, 2000. *See* Ex. 4. The Administrative Law Judge ("ALJ") found that Espy's impairments, which are considered to be "severe" under the Social Security Act, were his degenerative disc disease, disc herniation L1-2, status post lumbar fusion at L4-5, spondylolisthesis Grade II, radicular pain on the right, and

---

[9]Apparently, there was only selective consideration of the doctors' reports.

cervical pain. The ALJ found that Espy's impairments prevent him from performing work activity above the sedentary exertion level. The ALJ also found that Espy was unable to perform his past relevant work. KNS did not have the benefit of the Social Security determination when conducting the General Peer Reviews.

On September 19, 2001, the FEC's Benefit Review Committee ("BRC") reviewed Espy's request for LTD benefits beyond April 11, 2001. *See* Ex. 5. The BRC denied Espy's request on the "basis of the plan provision which states no benefits will be paid by the plan unless evidence of significant objective findings exists that would prevent you from performing the duties of your occupation." The BRC based this decision on KNS's physician reviews and the clinical information submitted with Espy's appeal request. It concluded by commenting that its decision represented the final step of the administrative review process.

Espy voluntarily resigned his employment with FEC on August 7, 2001. FEC had paid short term disability benefits from February 8, 2000, until August 27, 2000. FEC had also paid long term disability benefits from August 28, 2000, until April 11, 2001.

Espy filed this civil action in the Circuit Court of Etowah County, Alabama. After FEC removed the case to this court, Espy filed an amended complaint on November 14, 2001, claiming a wrongful denial of benefits under ERISA § 502(a)(1)(B). *See* 29 U.S.C. § 1132(a)(1)(B). On November 15, 2001, Espy filed a motion for summary judgment on his claim for wrongful denial of LTD benefits. On December 10, 2001, FEC and filed a cross-motion for summary judgment on the same issue. Both motions were denied on February 28, 2002. Subsequently, the parties agreed to have the court decide this case based upon the record, without a trial.

## II. The LTD Provisions

From the pleadings and briefs of the parties, it appears that only certain provisions of the LTD Plan, available as Exhibit 1, are pertinent to this case.  They main provisions in dispute can be summarized as follows:

1.      Sections 1.1(a) & 1.1(g) provide that FEC will be the administrator of the LTD Plan.

2.      Section 3.2 provides that the LTD Plan will provide long-term disability benefits at an amount equal to 60% of an employee's monthly salary, up to a maximum of $7,500 per month.

3.      Section 3.3(b)(3)(i) provides that an employee may recover for an Occupational Disability for a maximum of two years.  After this two year period, an employee must be deemed Totally Disabled in order to continue receiving benefits.

4.      The LTD Plan provides definitions for the varying degrees of disability.[10]   Section 1.1(k) defines "Disabled" as

> Disability or Disabled shall mean either an Occupational Disability or a Total
> Disability; provided, however, that a Covered Employee shall not be deemed to
> be Disabled or under a Disability unless he is, during the entire period of
> Disability, under the direct care and treatment of a Practitioner and such
> Disability is substantiated by significant objective findings which are defined as
> signs which are noted on a test or medical exam and which are considered

_____

[10]The LTD Plan's summary plan description also states:

**Significant Objective Findings (Proof of Disability)**

Significant objective findings of a disability are necessary to substantiate the period of time your health care professional indicates you are disabled.  Significant objective findings are those that can be observed by your health care professional through objective means, not just from your description of the symptoms.  Objective findings include:

- Medical examination findings
- Test results
- X-ray results
- Observation of anatomical, physiological or psychological abnormalities

**Pain, without significant objective findings, is not proof of disability.**

significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms.[11]

Section 1.1(t) defines "Occupational Disability" as

> Occupational Disability shall mean the inability of a Covered Employee, because of a medically-determinable physical impairment or Mental Impairment (other than an impairment caused by a Chemical Dependency), to perform the duties of his regular occupation. Occupational Disability shall include a natural physical deterioration which impairs a Covered Employee's ability in connection with his duties in the operation or maintenance of an aircraft, vehicle or any other such equipment requiring licensing for its operation or maintenance and which results in the revocation of such license and denial of restoration thereof.

Section 1.1(dd) defines "Total Disability" as

> Total Disability shall mean the complete inability of a Covered Employee, because of a medically-determinable physical impairment (other than an impairment caused by a mental or nervous condition or a Chemical Dependency), to engage in any compensable employment for twenty-five hours per week for which he is reasonably qualified (or could reasonably become qualified) on the basis of his ability, education, training or experience.[12]

5.    Section 5.3(d) grants the BRC the authority to interpret the plan provisions:

> Authority of Committee. The committee appointed pursuant to subsection (c), shall be empowered to interpret the Plan's provisions in accordance with its terms with respect to all matters properly brought before it pursuant to this Section 5.3, including, but not limited to, matters relating to the eligibility of a claimant for benefits under the Plan. The determination of the committee shall be made in a fair and consistent manner in accordance with the Plan's terms and its decision shall be final, subject only to the determination by a court of competent jurisdiction that the committee's decision was arbitrary and capricious.

6.    Section 4.1 details how the LTD is to be funded:

> Company Contributions. The Employer shall make contributions to the Trust Fund for each fiscal year in such amounts as are actuarially determined to be sufficient to fund on a level basis the benefits provided hereunder.

---

[11]There were significant objective findings.

[12]The court will reserve ruling on whether these conditions have been met.

## ARGUMENTS

In reviewing FEC's decision to terminate Espy's LTD benefits, Espy argues, this court

should apply either a *de novo* or heightened arbitrary and capricious standard of review.

According to Espy, *de novo* review is the default standard of review of administrator's decisions,

unless the plan document explicitly vests the administrator with discretion. *See Florence*

*Nightingale Nursing Services v. Blue Cross*, 41 F.3d 1476, 1481 (11th Cir. 1995) ("The Supreme

Court has held that, as a general matter, courts should review claims administrators' denials of

ERISA benefits under a *de novo* standard."). Under the *de novo* standard of review, the court

reviews the file and makes the decision for itself. Espy notes that FEC grants discretionary

authority to its own in-house review committee. *See* Ex. 1 at § 5.3. Nonetheless, Espy argues

that the standard of review should be *de novo,* since there has been no effective delegation of

authority to a *third party*. However, Espy does not cite any cases supporting the proposition that

delegation must be made to a third party for the arbitrary and capricious standard to apply.

In the alternative, Espy notes that the Eleventh Circuit has created a heightened arbitrary

and capricious standard where the decision maker has a conflict of interest. *See Brown v. Blue*

*Cross & Blue Shield*, 898 F.2d 1556 (11th Cir. 1990), *cert. denied*, 498 U.S. 1040 (1991). Under

this standard, the court must "first conduct a *de novo* review to decide if the determination was

wrong." *Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755, 758 (11th Cir. 1996). As

Espy explains, if the decision of the administrator was wrong, the court must then determine

whether the decision was reasonable, and, if so, whether it advances the conflicting self-interest

of the defendant. *Id; see also Lee v. Blue Cross Blue Shield of Alabama*, 10 F.3d 1547, 1551

(11th Cir. 1994). In essence, the burden shifts to the plan administrator to demonstrate that the

decision was not tainted by self-interest. *Brown*, 898 F.2d at 1566.  Espy claims that an inherent

conflict of interest exists because the LTD Plan is self-funded[13] and FEC reserves final authority

to approve or deny benefits. *See* Ex 1 at §§ 4.1 & 5.3.  In other words, because denying benefits

would save FEC money in the long run, it is operating under a conflict of interest.  Espy

acknowledges that there are no Eleventh Circuit cases with completely analogous facts, but he

cites *Godfrey*, 89 F.3d at 757-58, and *Maracek v. BellSouth Servs., Inc.*, 49 F.3d 702 (11th Cir.

1995) to suggest that the Eleventh Circuit would support finding a conflict of interest when a

uninsured plan delegates eligibility determinations to an in-house committee.

Under either standard of review, Espy argues, the first issue is whether FEC and KNS

made the wrong decision in denying the LTD benefits.  According to Espy, he is disabled as

defined by the LTD Plan and is entitled to benefits.  In support of this proposition, Espy asserts

that he had not been released from the care of his treating physician, Dr. Jones.[14]  He claims that

the letters of Dr. Jones, dated June 21 and 22, 2001, also confirm his disability.  In the letters

submitted by Espy's counsel to FEC, Dr. Jones stated that his staff had repeatedly attempted to

contact KNS to discuss Espy's condition:

> I have received notice that he had been returned back to work as of 4/4/01.  This
> was due to lack of medical information to support continued disability.  Mr. Espy
> had a spinal fusion at L4-5 on 7/21/00.  That surgery can take twelve to eighteen
> months to heal completely.  In my 4/9/01 office note I do state that the fusion is
> healing in good position.  That does not mean it is completely healed.  Mr. Espy
> has a return appointment on 8/31/01 for a repeat x-ray to check the progression of
> his spinal fusion.  If the fusion does not heal properly it can cause a non-union
> which would require another surgery.  My staff has repeatedly tried to reach

---

[13]All proceeds payable under the plan are paid from a trust; however, FEC must fund that trust every year. *See* Ex 1 at § 4.1.  Presumably, if the payouts increase, FEC will be required to contribute more to the fund.

[14]  On April 9, 2001, Dr. Jones submitted a report to KNS that stated the following: "no lifting.  Patient is off work until 8/13/01."

> Kemper to discuss this problem with no results.  If he could be returned for some
> type of light duty he would need to get an FCE to get permanent restrictions.

Instead of exercising their option to have Espy submit to examination by another physician, FEC

and KNS simply submitted his medical records to Dr. Sassoon.[15]  Espy notes that Dr. Sassoon

did not state an opinion that Espy was not disabled.  Instead, Dr. Sassoon stated that there was

"insufficient clinical documentation" of a disability.  *See* Ex. 3 at E1.  After Dr. Sassoon's

denial, Espy submitted the independent report of Dr. Ganuza, and he informed FEC that he has

been awarded Social Security disability benefits with an onset date of February 8, 2000.  FEC

and KNS did not consider the Social Security award.  *See* Ex. 3 at F1.  Espy argues that they

should have, given that plan administrators have a continuing duty to consider all the evidence

submitted, even if it is submitted after a denial.  *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208

(11th Cir. 1997).  In any event, Espy argues, this court can consider the Social Security award.

*Kirwan v. Marriott*, 10 F.3d 784 (11th Cir. 1994).

In light of these facts, Espy claims that there is no evidence to substantiate a denial of

benefits under any standard of review.  Assuming the heightened arbitrary and capricious

standard applies,[16] Espy explains, the court must next determine whether the decision was

nonetheless reasonable and, if so, whether it advances the conflicting self-interest of the

defendant.  *Godfrey*, 89 F.3d at 758.  Espy argues that the decision was not reasonable because

Dr. Jones' report dated April 9, 2001 clearly states that Espy could not lift or return to work.

---

[15]Espy seems to imply that the LTD does not allow a "paper review" to be the basis for terminating benefits; rather, the LTD calls on FEC to seek a second doctor's examination.  *See* Espy's Initial Brief at 5.  FEC counters that since it must review the records before knowing whether to seek a second examination, the right to conduct a paper review is implied in the LTD.  *See* FEC's Reply Brief at 3-4.

[16]As noted above, if the *de novo* standard applies, the court simply looks at whether FEC made the wrong decision.

Espy states that KNS never wrote Dr. Jones or questioned him concerning his evaluation. Instead, Espy notes, KNS submitted his medical records for a "paper review" to Dr. Sassoon. KNS and FEC based their decision on Dr. Sassoon's findings that there were no significant objective findings of disability, in spite of the vast amount of evidence Espy submitted to the contrary. Espy argues that FEC cannot terminate his benefits "solely because [FEC] suspects something may be awry. . . . Without some concrete evidence . . . that supports the denial of the claim, [courts] must find the administrator abused its discretion." *Vega v. National Life Ins. Servs., Inc.*, 188 F.3d 287, 302 (5th Cir. 1999).

FEC makes two arguments in response. First, it argues that the decision made by the BRC was legally correct. According to FEC, a court reviewing a plan administrator's denial of benefits must first determine if the decision of the administrative review committee was legally correct. *Collins v. American Cast Iron Pipe Co.*, 105 F.3d 1368, 1370 (11th Cir. 1997). If the committee's decision was legally correct, the inquiry ends there.

FEC contends that the BRC's decision was legally correct for several reasons. First, it notes that the reports from Espy's doctor state that the spinal fusion was healing solidly and that his muscles were at full strength. Second, it states that Espy's independent medical evaluation performed by Dr. Ganuza revealed normal neurological evaluation and normal muscle strength. It also notes that the evaluation indicated that Espy "certainly" reached maximum medical improvement "at the time of examination" on April 4, 2001. Third, it notes that Dr. Jones suggested that Espy obtain a functional capacities evaluation report to determine Espy's work abilities and limitations; however, Espy never submitted a functional capacities evaluation to KNS or the BRC. FEC argues that Espy's failure to submit to a functional capacities evaluation

13

should be detrimental to his claim, because the medical information available without such an

evaluation showed that Espy was healing and capable of performing his duties.[17] Finally, FEC

comments on Espy's reliance on the Social Security Administration's award of disability

benefits. FEC places little significance on this finding because the Social Security

Administration's determination concerns a different proceeding, uses a different standard, and is

not itself medical evidence. FEC also points out that the Eleventh Circuit has already found that

an award of benefits by the Social Security Administration is not dispositive in determining

whether a plan administrator wrongfully denied benefits. *See Paramore*, 129 F.3d at 1446 n.5.[18]

The LTD Plan's "Cessation of Benefits" section provides that benefits will cease when

the employee "recovers from his Disability" or "fails to furnish . . . information, as requested by,

. . . the Claims Paying Administrator." *See* Ex. 1 at § 3.3(b). According to FEC, both

contingencies are satisfied in this case. For example, the information submitted by Dr. Jones that

the spinal fusion was healing solidly and that Espy's muscles were at full strength could be

interpreted as objective evidence that Espy had recovered from his disability. The same could be

said of Dr. Ganuza's evaluation. In the alternative, FEC argues that these reports show that Espy

failed to submit significant objective findings of disability to KNS. FEC notes that the burden is

on Espy to prove he is disabled. *See Vega*, 188 F.3d at 298. In either case, the decision to deny

benefits was legally correct.

---

[17]In its order denying summary judgment, the court suggested that the parties might want to seek a functional capacities evaluation. In his reply brief, Espy takes issue with FEC's claim that he should submit to one, arguing that the appropriate inquiry is whether he was disabled at the time of the review, not whether he is disabled now. Espy argues that an administrator cannot rely on information obtained after a lawsuit has been filed. *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001).

[18]As Espy notes however, a court can consider such an award.

FEC also argues that even if the administrator's decision was legally incorrect, the court should still uphold the decision of FEC and KNS because it was not arbitrary and capricious, which it contends is the standard of review that applies in this case.  FEC contends that the LTD Plan grants discretion to the BRC and, consequently, the *de novo* review is not appropriate.  *See* Ex. 1 at § 5.3(d).  Likewise, it argues that the heightened arbitrary and capricious review is not appropriate because the conflict of interest analysis does not apply to uninsured, or self-insured, plans.  FEC argues that the Eleventh Circuit established the heightened arbitrary and capricious standard to deal specifically with insured plans.  FEC notes that the assets of uninsured plans are held in trust, and that "[t]he basis for the deferential standard of review in the first place was the trust nature of most ERISA plans." *Brown*, 898 F.2d at 1561 (quoting *Moon v. American Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir. 1989)).  By contrast, when an insurance company (i.e., an insured plan) makes the eligibility decisions and pays the claims out of its own assets, "the most important reason for deferential review is lacking." *Brown*, 898 F.2d at 1561.[19]

To support the proposition that uninsured plans are not subject to the *Brown*-type conflict analysis, FEC points to several specific provisions of the LTD Plan.  FEC notes that the payments are made to beneficiaries out of the assets of a trust and not FEC's general operating budget.  *See* Ex. 1 at § 3.9.  Further, FEC's contributions to the LTD Plan are "irrevocable" and can never inure to the benefit of FEC.  *See* Ex. 1 at § 4.3.  Further, it notes that the BRC relies on independent medical consultants that have no interest in what the LTD Plan must pay out in disability benefits.  *See Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 n.3 (7th Cir.

---

[19]FEC also cites *Adams v. Thiokol Corp.*, 231 F.3d 837, 843 (11th Cir. 2000), to support its insured/uninsured distinction.  FEC further notes that at least one district court has found that this particular LTD Plan does not create a conflict of interest, based upon an insured/uninsured distinction.  *See Nelson v. Federal Express Corp.*, No. 1:93-CV-0497-JOF (N.D. Ga. Sept. 30, 1994).

1994) (finding that heightened arbitrary anc capricious standard not applicable when administrator uses independent medical consultants).  Finally, FEC submits the affidavits of August Lauer, Andy Nix, and Kelly Jenkins, all of whom are members of the BRC, and all of whom state that they have no knowledge of whether FEC would be required to increase its contributions to the LTD trust if payouts increased.[20]  In light of these facts, FEC argues that Espy has presented no proof of a conflict of interest, and requests that this court apply the arbitrary and capricious standard of review.

FEC claims that since the arbitrary and capricious standard applies, the plan administrator's factual findings are to be reviewed under the arbitrary and capricious standard as well.  *See Parker v. Rose*, 147 F. Supp. 2d. 1376, 1380 (M.D. Ga. 2001).  When reviewing pursuant to the arbitrary and capricious standard, "the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Jett v. Blue Cross & Blue Shield*, 890 F.2d 1137, 1139 (11th Cir. 1989).

FEC contends that the Committee's decision to deny further LTD benefits was not arbitrary and capricious.  In support of this proposition, FEC points to generally the same information that it pointed to in arguing that the decision to deny benefits was legally correct.  Thus, even if this court should disagree with the BRC's decision, that decision was reasonable and supported by substantial evidence known to the administrator at the time the decision was made.

Assuming the court does find for Espy, the two sides also disagree as to the amount of

---

[20]The affidavits were not included as part of the stipulated facts; rather, they were attached to FEC's Brief in support of its Motion for Judgment.

16

damages recoverable and the pre-judgment interest rate to be applied to that award.  Espy notes

that he was paid $1,600 per month in Occupational Disability benefits under the LTD Plan.

Thus, he argues that he is entitled to at least $25,600, covering the sixteen months from when his

benefits were terminated until the time of judgment in this case.[21]  FEC counters that Espy is not

entitled to $1,600 per month up until the date of judgment.  FEC argues that Espy's two-year

period of Occupational Disability benefits under the LTD Plan expired on August 27, 2002.  Any

benefits recoverable after that date would be paid as Total Disability benefits under the LTD

Plan.  Thus, FEC argues that since the BRC has not yet determined whether Espy is totally

disabled, a remand to the BRC is appropriate for any benefits payable after August 27, 2002.

*Levinson*, 245 F.3d at 1330 (holding that as a general rule, remand to the administrator is the

appropriate remedy when the administrator has not had the opportunity to consider evidence on

an issue).

      FEC also argues that "damages" are not even recoverable under ERISA; rather, the court

can award only equitable relief.  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204,

___, 122 S. Ct. 708, 711, 151 L. Ed. 2d 635, 642-43 (2002).  Thus, FEC argues that this court

should order only that FEC pay back benefits due, not a specific amount of money.  This would

allow the parties to calculate the appropriate amount of money due to Espy, including any offset

due in light of the Social Security award.[22]

---

[21]Espy's benefits were terminated on April 11, 2001; thus, sixteen months from that date would have concluded on August 11, 2002.  Presumably, he would also like an additional pro rata amount to cover the period from August 11 to the date judgment is entered.

[22]FEC argues that Espy's contention that an offset has not been pled in this case is misleading, because it denies liability altogether.  FEC argues that should the court find for Espy, then, pursuant to the plan terms, offsetting the Social Security Award would become an issue.

As to the amount of interest to be applied to any judgment, Espy argues that pursuant to Ala. Code § 27-1-17(b), he is entitled to 18% interest. *See Florence Nightingale*, 41 F.3d at 1484 (affirming the district court's award of interest under Ala. Code § 27-1-17(b)).  FEC argues that Ala. Code § 27-1-17(b) applies only when an insurance company denies a claim for an invalid reason. *Florence Nightingale*, 41 F.3d at 1484.  Since no insurance company is involved here, FEC argues that the court should apply the Alabama statutory interest rate of 6%. *See* Ala. Code § 8-1-1.

### CONCLUSIONS OF THE COURT

The court, of course, accepts all the stipulated facts as true, regardless of whether it has reiterated them above.  Having considered the total stipulated facts, the court finds and concludes as follows:[23]

The court finds and concludes that the decision to terminate plaintiff's benefits as of April 11, 2001 was factually and legally incorrect.  There was substantial, unrebutted evidence that the plaintiff was still, at the very least, suffering from an "Occupational Disability."  For example, when asked whether plaintiff had reached maximum medical improvement, Dr. Jones said "no." *See* Ex. 3 at C3.  Further, Dr. Jones' letter of June 21, 2002 stated that plaintiff was still under care while his back healed, and that "[h]e is not working at this time, he is under disability." *See* Ex. 3 at B20.  There was substantial objective evidence that such a disability existed.  The mere fact that there had been some improvement and some healing since the surgery did not belie the fact that there was an objective problem which resulted in surgery.  Two physicians and the Social Security Administration concluded that there were still significant

---

[23]The court has injected comments in earlier footnotes.

18

problems.   FEC's decision makers were arbitrary and capricious in deciding that the "Occupational Disability" payments should terminate.  It is not necessary for the court to determine if some other standard of review is appropriate.  If it is, the conclusion is even more obvious.

If the court were to make a present decision as to "Total Disability," it would make the same decision, for the same reasons, as it has made with regard to the "Occupational Disability" issue.  It is not, however, clear to the court whether it should decide that issue now or "remand" the issue for further consideration and determination by the BRC.  Further, it is not clear to the court whether there has been any determination that the plaintiff cannot "engage in any compensable employment for twenty-five hours per week for which he is reasonably qualified (or could reasonably become qualified) on the basis of his ability, education, training or experience." *See* Ex. 1 at § 1.1(dd).  The parties will, within fifteen (15) days, submit to the court highlighted portions of controlling cases which purport to govern these issues.

After the court has made its decision it will, in any event, establish another briefing schedule with regard to the determination of amounts owed if the parties cannot resolve that issue.

This ____ day of September, 2002.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

19